UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRESÓNA MULTIMEDIA, LLC,<br><br>Plaintiff,<br>v.<br><br>PRE-CLEARED LIMITED D/B/A<br>CLICKNCLEAR, CHANTAL EPP, and<br>DAVID WALSH,<br><br>Defendants. | CASE NO. 1:25-cv-6202<br>_____<br><br>JURY TRIAL DEMANDED<br><br>**COMPLAINT** |

Plaintiff Tresóna Multimedia LLC ("Plaintiff" or "Tresóna"), by and through its undersigned attorneys, complains and alleges against Defendants Pre-Cleared Limited d/b/a ClicknClear (hereinafter "ClicknClear"), Chantal Epp (hereinafter "Epp"), and David Walsh (hereinafter "Walsh") (collectively, "Defendants") as follows:

**NATURE OF THE ACTION**

1.     By this action, commenced pursuant to the Lanham Act and related New York State statutes, Tresóna seeks redress for the injury caused to it and a targeted consuming public by the false, deceptive, and misleading statements and practices of Defendants made in the commercial advertising of and about ClicknClear's music licensing products and services.

2.     Both Tresóna and ClicknClear are licensing agents in the music industry, issuing licenses from music rightsholders to a niche market comprised of, *inter alia*, scholastic, community, and professional organizations, whose members include vocal ensembles, marching bands, color guards, show choirs and similar performing groups throughout the United States. Tresóna has operated in this market since 2009.

3.      ClicknClear, a company from the United Kingdom and operated by its two U.K. principals, Chantal Epp and David Walsh, entered the U.S. market in or about 2016. At this early stage, ClicknClear's business then focused on a different segment of the industry and a different means of serving it, namely operating a website where consumers could purchase permanent digital downloads of music with the added permissions to use the purchased music in non-commercial remixes (for example, a cheer team using a popular song as part of a remix for its routines).

4.      Since at least 2021, ClicknClear has been actively soliciting organizations and members in the niche areas described above, seeking licensing opportunities in direct competition with Tresóna.

5.      As set forth in detail below, Defendants' foray into this specific U.S. market has been rife with false and misleading statements to consumers about U.S. music licensing law, about the nature of required rights for music license, and about ClicknClear's products and services. These false and deceptive advertising and solicitation efforts have also included false or misleading statements about Tresóna's products and services, all deliberately designed to harm Tresóna's business and gain an unfair competitive advantage for ClicknClear.

6.      After Tresóna became aware of ClicknClear's wrongful conduct, it made every effort to avoid litigation by communicating with ClicknClear about its concerns and demanding that ClicknClear and its principals Epp and Walsh cease and desist from the foregoing conduct. These efforts were met with callous disregard, coupled with Defendants' increasingly arrogant display of confidence in providing unauthorized legal advice regarding U.S. music licensing law to the subject target audience and market.

7.      Upon information and belief, none of the Defendants is licensed in any jurisdiction in the U.S. to provide legal advice, and thus none has the right—no less the ability—to provide legal advice, let alone inaccurate legal advice, as to the law of the U.S. for music licensing. Stated simply, ClicknClear and its principals are engaged in the unauthorized practice of law in the U.S., brazenly claiming in a trademark registration with the United States Patent and Trademark Office that ClicknClear is offering "legal services" and providing "legal advice for owners and users of intellectual property rights, copyright and related rights."

8.      In their efforts to grow a new business in this niche market, Defendants embarked on a pitch campaign designed to capitalize on the confusion that often exists among an audience of persons who are not sophisticated in music licensing law or practice, which involves a complex array of rights.

9.      Defendants have engaged and are engaging in false and deceptive advertising, exploiting this confusion and these complexities and using fear tactics about infringement litigation, to induce prospective licensees to obtain licenses from ClicknClear purported rights that Defendants have no right to license, that do not exist, or that are not necessary to license under the facts and circumstances. While Defendants may also advertise and offer certain legitimate licenses, their advertisements are tainted by the inclusion therein of false or illusory licenses in blanket presentations, adding to the confusion.

10.      In some instances, Defendants misleadingly advertise ClicknClear's licensing of rights that, upon examination of its standard license product, turn out not to have been licensed at all.

11.     As a primary example of one of Defendants' false advertising statements, Defendants claim that members of certain organizations described above must obtain licenses from music rightsholders to "Practise Alone" the music that they are learning and that such a license is a part of its standard product offering. But there is no such requirement; to claim that is ludicrous. Stated simply, a person who, for example, purchased sheet music does not need a separate license to practice that music on an instrument alone.

12.     Defendants also use inconsistent and misleading statements and information to advertise their products and services about what type of license is required to publicly perform music, about ClicknClear's ability to offer public performance licenses, and about the role of the performing rights organizations in the U.S. in issuing those licenses.

13.     In one of their most egregious tactics, Defendants purport to be the official arbiter about whether a license issued to an organization, performer, or athlete by a third-party is valid under U.S. law by advertising a service coined as its "License Verification System." It is beyond cavil that Defendants have no authority to make these "License Verification" determinations as to third-party licenses, which is a strictly legal matter, nor could Defendants ever "verify" a license issued by a third-party.

14.     Defendants indeed have admitted this advertising product is in reality a "conversion tool" to induce converts to the ClicknClear license system. This tool is also used to reinforce ClicknClear's false statements pertaining to license requirements and steer consumers away from competitors, such as Tresóna.

15.     Finally, ClicknClear has made its intent to harm Tresóna clear; it has expressly discussed Tresóna in a disparaging way in public presentations and communications with

consumers, falsely stated that ClicknClear's products and services are better because they are allegedly "pre-cleared", when Tresóna's allegedly are not, and because ClicknClear's license allegedly covers "all of the rights" needed, when Tresóna's allegedly do not.

16.    By including illusory license requirements and false and misleading purported verification services in its products and services advertised in commerce, Defendants are succeeding in deceiving and misleading consumers and inducing them to purchase ClicknClear products and services, to the detriment of the targeted audience and to the detriment of Tresóna. This conduct must be stopped.

## JURISDICTION AND VENUE

17.    This Court has original jurisdiction over the subject matter of the claim arising under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

18.    This Court has supplemental jurisdiction over the subject matter of the claim arising under New York General Business Law §§ 349, 350-a pursuant to 28 U.S.C. § 1367(a) because such claim forms a part of the same case or controversy as the claim under the Lanham Act.

19.    This Court has personal jurisdiction over Defendants because, upon information and belief, Defendants regularly conduct, solicit, and/or transact business in the State of New York and in this District, and in the U.S. generally, including by advertising and offering for sale licenses which include illusory rights, making false and deceptive statements to consumers including about Tresóna's business, and by purporting to provide without legal license legal advices and services to consumers in this District and throughout the U.S. Tresóna's claims arise directly from these actions. Upon further information and belief, Tresóna alleges without limitation:

5

a.   Defendants have targeted consumers in New York and across the U.S. with their false and deceptive advertising practices and provision of legal services without proper licensure;

b.   For example, ClicknClear, at the direction of and with the assistance of Defendants Epp and Walsh, obtained a U.S. trademark registration from the United States Patent and Trademark Office ("USPTO") for the mark "CLICKNCLEAR" for use in connection with, *inter alia*, "Legal Services," and in particular, "providing legal information and legal advice for owners and users of intellectual property rights" (U.S. Reg. No. 6,236,184);

c.   Consumers in New York and across the U.S. have viewed ClicknClear's false and deceptive advertising, including materials presented either in person or *via* remote teleconference by Defendants Epp and Walsh at industry conferences and events, and have been induced to purchase licenses from ClicknClear which purport to extend illusory rights, based on misrepresentations of U.S. licensing practices and copyright law;

d.   Consumers located in New York, and across the U.S., have engaged ClicknClear for purported legal services by using an interactive online service created by ClicknClear, advertised to them by Defendants Epp and Walsh, called its "License Verification System" or "LVS," to purportedly verify third party licenses, including Tresóna's licenses, including licenses issued to entities in New York and in the wider U.S.;

e.   ClicknClear's two principals, Defendants Epp and Walsh, regularly travel to the U.S., and specifically to this District, for the purpose of furthering and promoting all of the above-referenced activities, and for the purpose of soliciting licensing relationships with U.S. music rights owners and related groups, a substantial number of which are located in this District;

f.    ClicknClear has entered into contracts with third parties in New York in connection with the goods and services that Defendants have falsely advertised and promoted; and

g.    ClicknClear, including Defendants Epp and Walsh, know the foregoing conduct is likely to cause harm to Tresóna and to consumers in New York and in the U.S.

20.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district and/or because a substantial part of the events giving rise to this action occurred in this judicial district.

## PARTIES

21.    Tresóna Multimedia, LLC is an Arizona limited liability company with a principal place of business in Scottsdale, Arizona.

22.    Upon information and belief, Defendant Pre-Cleared Limited d/b/a ClicknClear is a United Kingdom Company with a registered address of International House, 24 Holborn Viaduct, London, United Kingdom.

23.    Upon information and belief, Defendant Epp is a national of the United Kingdom, residing in Ely, Cambridgeshire, England.

24.    Upon information and belief, Defendant Walsh is a national of the United Kingdom residing in Cambridge, England, with a secondary address in the Turks and Caicos Islands.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Tresóna's Background and Business

25.    Founded in 2009, Tresóna is a music copyright licensing agent and SaaS technology developer for music publishers and songwriters. For over 15 years, Tresóna has issued licenses for musical compositions and certain sound recordings to scholastic, community, and professional

organizations for and on behalf of music publishers and songwriters. These organizations include marching bands, instrumental ensembles, vocal ensembles, color guards, show choirs, and other similar performing arts groups across all levels including high school, college, community, and professional settings.

26.    Tresóna issues these organizations licenses from rightsholders in the music industry for legitimate rights including for print, synchronization, dramatic performance, and remixing (as they are referred to in the industry).

27.    Tresóna first issues licenses to these organizations within the library of works for which it is authorized to act, and then administers these licenses on behalf of the various music rightsholders. The licenses that Tresóna grants and then administers on behalf the rightsholders generate royalties that benefit not just the rightsholders, but also the songwriters and creators of the musical works and sound recordings.

## ClicknClear's Business and Targeted Consumers

28.    Defendant entity Pre-Cleared Ltd. is a competitor of Tresóna, formed in the United Kingdom in August 2016 by Defendant Epp.

29.    Upon information and belief, Epp has been at all relevant times ClicknClear's Chief Executive Officer and the majority shareholder of ClicknClear, assisted by Defendant Walsh, who has described himself as the company's "Investor / Director." According to the U.K. online register of companies, Defendants Epp and Walsh are ClicknClear's sole officers and directors.

30.    ClicknClear, like Tresóna, is in the business of issuing licenses for musical works and sound recordings to scholastic, community, and professional organizations.

31.     According to ClicknClear's website, available at www.clicknclear.com (the "ClicknClear Website"), ClicknClear advertises—*i.e.,* seeking business in the U.S.—"Official Licensed Music for your Choreographed Sports, Arts or Fitness Mix and Online Events." *See* **Figure 1** below:



**Figure 1**

32.     As specified on the ClicknClear Website, ClicknClear's targeted customers are, like Tresóna's customers, organizations and individual members thereof participating in activities such as artistic swimming, cheerleading, color guard, dance, dressage, figure skating, fitness, gymnastics, indoor skydiving, and jump rope, as well as band and vocal ensembles throughout the U.S. *See* **Figure 2** below.

9



**Figure 2**

33.     Upon information and belief, participants in all but one of the above-referenced activities do not themselves play, sing, or otherwise create music, but rather perform to pre-recorded sound recordings. These activities as advertised by Defendant are as follows:

a.     **Artistic swimming** is a performance sport in which teams perform choreography in a pool to recorded music. They practice and perform in swimming pools and aquatic centers.

b.     **Cheerleading** is a performance sport in which teams perform choreography, acrobatics, and gymnastics. They practice and perform in gymnasiums, stadiums, arenas, and other event centers.

c.  **Color guard** is a performance sport in which teams perform choreography using equipment including flags, batons, rifles, and sabers. Color guards often perform with marching bands and drum corps. They practice and perform in gymnasiums, stadiums, arenas, and other event centers.

d.  **Dance** is competitive dancing, in which a dancer or dancers perform choreography individually, in pairs, or in teams. Dance can be practiced and performed in a variety of venues.

e.  **Dressage** is a performance sport in which an individual performs on horseback set to music. They practice and perform in equestrian centers and other venues.

f.  **Figure skating** is a performance sport in which participants ice skate and perform choreography set to music. They practice and perform in ice skating rinks and arenas.

g.  **Fitness** is fitness routines set to music. These fitness routines are often taught in classes by a single or multiple instructors. The routines are given in fitness centers and other similar venues.

h.  **Gymnastics** is a performance sport in which gymnasts perform routines to music. They perform in stadiums, arenas, event centers, and other similar venues.

i.  **Indoor skydiving** is a performance sport where competitors perform in indoor skydiving machines set to music.

j.  **Jump rope** is a performance sport where performers perform jump rope routines set to music. They practice and perform in a variety of venues.

34.    Upon information and belief, for "**band/vocal ensembles**," ClicknClear, through Defendants Epp and Walsh, targets scholastic, community, and professional marching bands, drum corps, show choirs, and other instrumental and vocal ensembles, which organizations constitute a

central focus of the licensing business of Tresóna. Marching bands and drum corps consist of ensembles comprising mainly instrumental musicians, who play music and march in formation to that music, sometimes with choreographic elements, as well as color guards and sometimes dance teams, who may perform choreography accompanied by music. Similarly, such show choirs and vocal ensembles consist mainly of vocal musicians who sing and perform music, sometimes accompanied by instrumentalists or recorded backing tracks, and who may perform choreography in accompaniment as well. In addition to performing in various venues, all of these ensembles require their members to practice their individual parts by themselves and have group practices as well. As with the other target audiences, activities conducted by participants and organizations in the "band/vocal ensembles" category are considered performance sports.

### Initial Interactions Between Defendants and Tresóna

35.     Tresóna first became aware of ClicknClear in or around 2018 when their principals participated in a music industry panel together in New York. At the time, however, ClicknClear's and Tresóna's business models were separate and distinct enough that from 2018 through much of 2021, Tresóna and ClicknClear coexisted without interaction or confrontation. ClicknClear had been primarily operating a website where consumers could purchase permanent digital downloads of music with the added permissions to use the purchased music in non-commercial remixes (for example, a cheer team using a remix of a popular song for its routines).

36.     In or around mid-2021, Tresóna discovered that ClicknClear had been actively soliciting organizations and members in the niche areas described above, seeking licensing opportunities in direct competition with Tresóna.

12

37.    At this point, Tresóna also first became aware of ClicknClear's use of false and deceptive tactics in its advertising. Tresóna was notified that, in a prominent Facebook group for marching band arrangers (*i.e.*, people who are paid to create sheet music), Defendant Epp, on behalf of ClicknClear, began engaging with consumers, including individuals in the U.S., by answering questions about ClicknClear's offerings. During this exchange, Defendant Epp suggested that ClicknClear was able to offer "arrangement" licenses (that is, licenses to create derivatives of musical works) for a lower price than Tresóna because "Tresona do [sic] not use a pre-cleared model so the cost is higher because manual work is involved on both sides."

38.    Defendant Epp's statements were and are false. Most licenses Tresóna issues for marching bands are pre-approved (*i.e.,* "pre-cleared") for arrangement, and Tresóna's system has always indicated which songs were pre-approved for this use to the specific licensee submitting the license request.

39.    Upon information and belief, Defendant Epp's statements about ClicknClear's own ability to issue licenses relevant to the marching band market on a "pre-cleared" basis, including for and on behalf of rightsholders with whom Tresóna worked and works, were also false and remain false.

40.    Because of the false statements about its product and service, Tresóna sent a letter to ClicknClear on June 1, 2021 demanding, *inter alia*, that it issue a retraction thereof. Defendant Epp responded for ClicknClear on June 4, 2021, agreeing to issue a retraction, thereby clearly recognizing that the statement was both false and damaging to Tresóna. ClicknClear also conceded it did not issue licensing relevant to the marching band market at that time and in a separate post

Defendant Epp clarified that ClicknClear did not issue print licensing for the creation of sheet music, a right required by arrangers for marching band.

41.     After sending the 2021 letter and following further email exchanges with ClicknClear, Tresóna decided to forgo taking any further action, having put ClicknClear on notice of its false and misleading conduct.

42.     As explained hereinbelow, regardless of its wrongful conduct acknowledged in this 2021 exchange, Defendants nonetheless embarked on further false advertising, making additional misleading statements in advertising about music licensing, its products and services, and about Tresóna's business.

43.     From 2022-2023, despite the fact that ClicknClear was again proffering misleading advertising and presentations, Tresóna attempted to avoid further disputes. Indeed, from time to time, Tresóna assisted ClicknClear at its request to obtain proper licenses for performance sports participants and organizations.

44.     At other times, Tresóna could not assist ClicknClear because they would seek to obtain a license that included rights that do not exist in the U.S. or were not necessary for uses by schools, which are exempt under U.S. law.

45.     For example, in September 2023, ClicknClear sought permission on behalf of a U.S. public school (one with which Tresóna had a pre-existing relationship since at least 2016) for the "right to choreograph to the music" the school was using. As discussed below, no such broad-based "right" exists, and ClicknClear could not explain (for that reason) why such licensing was required by this public school client. Tresóna would not agree to participate in issuing a license requiring payment for such illusory rights.

14

46.     Matters came to a head in November 2023 when ClicknClear again attempted to engage Tresóna for licensing with respect to another U.S. public school (yet again one with which Tresóna had an even longer pre-existing relationship since at least 2013) for a license that included rights that do not exist in the U.S. or were not necessary for certain uses by schools, which are exempt under U.S. law. Tresóna responded to ClicknClear *via* email, copying a representative of the public school, that Tresóna would not issue licenses for such illusory rights.

47.     Defendant Epp on behalf of ClicknClear sent a letter demanding that Tresóna cease and desist from "repeating false and misleading claims about ClicknClear's pricing and copyright licenses" and retract the statements made in the email. Tresóna did not do so, as the statements in its response were accurate. No further action was taken by ClicknClear.

48.     Ultimately, after further monitoring and seeing only escalations in ClicknClear's false advertising practices, on September 18, 2024, Tresóna sent a letter to the Federal Trade Commission to notify it of the multiple false and misleading statements being propounded by ClicknClear to U.S. consumers concerning the types of rights needed for various activities under U.S. law and falsely asserting that ClicknClear offered "the only legitimate music licensing solution for performance sports." *See* Exhibit A. This letter has been publicized, putting Defendants once more on notice of the impropriety of their conduct as alleged therein.

49.     Notwithstanding these confrontations and public notices, Defendants brazenly continue to falsely advertise, as detailed below, intent on harming Tresóna's business and deceiving the consumers and public with materially false statements about music licensing, its product and services, and the products and services of Tresóna to induce them to obtain ClicknClear's products and services.

**Defendants' False and Misleading Statements Regarding**

**ClicknClear's Licensing Services and Products**

50.     The ClicknClear Website maintains specific pages that are aimed at each of the markets for which it purports to issue licenses. Each such page contains information purporting to instruct consumers on the specific rights—and therefore specific licenses—that they will need to buy in order to conduct that particular activity, and whether those rights are included in ClicknClear-issued licenses.

51.     As one example, the ClicknClear Website, accessed by clicking for information about "Band/Vocal Ensembles," includes the below infographic and text shown in **Figure 3**, in which Defendant states: "Below is a breakdown of the rights that are needed to use a song in your performance" and "ClicknClear offer[s] ***all of these*** rights with our standard license" (emphasis added).[1] Ironically, ClicknClear states that "[t]here is often misleading information about what rights are required for ensembles," taking advantage of consumers' fear and uncertainty, while itself also disseminating false and misleading information about the same.

---

[1] *See* https://www.clicknclear.com/arrangements (last accessed July 28, 2025).

16



**Figure 3**

52.    On this page for "Band and Vocal Ensembles," the ClicknClear Website references certain rights that music-industry rightsholders have traditionally required to be licensed in similar circumstances, such as the right to create an "arrangement" of an existing song or to "[e]dit and adapt an existing track," as outlined in red below. *See* **Figure 4**. The right to make and distribute copies and phonorecords is also a legitimate right that rightsholders have required to be licensed.



**Figure 4**

53.    Yet in the same graphic, ClicknClear also falsely and misleadingly includes—as so-called "rights that are needed" and ClicknClear "offer[s]"—rights for which there is no basis in U.S. law, that have not been historically required by music industry rightsholders, and/or for which Defendant has no right to license. These include purported rights to "***practice alone***," and to "***set choreography to the song(s)***". ClicknClear also includes the right to "Perform the routine in public with music"—a performance right which ClicknClear does not license.

18

**Defendant's False and Misleading Statements Regarding**

**Purported Rights to "Practise Alone"**

54.    As shown below, the ClicknClear Website states that for band and vocal ensembles, the right to "Practise alone" is among "the rights that are needed to use a song in your performance[.]" *See* **Figure 5**.



**Figure 5**

55.    This is false and misleading because U.S. copyright law does not provide any music rightsholder with a separate exclusive right to prevent the "private performance" of its music properly obtained.

56.    For example, practicing the piano, or any instrument, "alone" to purchased sheet music is not something in and of itself that must be licensed.

57.    Under the Copyright Act, copyright owners possess an exclusive right to "publicly perform" their copyrighted musical works under 17 U.S.C. § 106(4), where "public performance" is defined as a performance "at a place open to the public or at any place *where a substantial number of persons outside of a normal circle of family and its social acquaintances is gathered* . . ." 17 U.S.C. § 101 (emphasis added).

58.    By stating in advertising that licensees must purchase a license to "Practise alone" Defendants are inducing the purchase of a license based on a materially false and deceptive premise and which has a tendency to deceive a substantial segment of the target audience.

59.    Defendants have repeated the false statement advertised on the ClicknClear website that there is a legal requirement under U.S. law that organizations and individuals must obtain a license in order to "practise alone" music they properly obtained.

60.    Defendants have made presentations which repeat this false statement to organizations in the U.S., including (as just one example) to Winter Guard International ("WGI"), the U.S.-based governing body for indoor color guard, percussion, and winds organizations and competitions (similar to indoor marching band), and its members in a presentation for the 2022-23 season.[2] The presentation given to WGI, currently available through WGI's website, specifically lists both Defendants Epp and Walsh as presenters. According to publicly available information including on its website, WGI is an Ohio non-profit corporation with hundreds of

---

[2] *See* https://www.wgi.org/wp-content/uploads/2022/09/WGIconClicknClear.pdf (last accessed July 28, 2025).

member organizations and more than 40,000 participants throughout the U.S., including in New York.

61.     Defendants' false advertisement claiming ClicknClear can issue a "required" license to "Practise alone" that is illusory harms both the targeted audience and Tresóna, as it suggests Tresóna cannot provide such a required license and thus that its product and services are inferior.  ClicknClear has made that exact claim during its marketing presentations.

## Defendants' False and Misleading Statements Regarding

## Purported Rights to "Set Choreography" to Music

62.     For all activities for which ClicknClear purports to offer licensing, ClicknClear also states consumers must obtain licenses for the right to "set choreography"—or "set a routine"—to musical compositions and/or sound recordings, even for the purpose of simply performing an activity accompanied by music in private.

63.     Indeed, on each of the ClicknClear Website's pages for artistic swimming, cheerleading, color guard, dance, dressage, figure skating, gymnastics, indoor skydiving, and jump rope, ClicknClear includes the below text and infographic (shown in close-up in **Figure 6**), advising that "the rights … needed" include a right to "[s]et choreography to the mix" [3]:

---

[3] On the "Bands and Vocal Ensembles" page of the ClicknClear Website, ClicknClear edits this supposed "right" to read "Set choreography to the song(s)." *See* https://www.clicknclear.com/arrangements (last accessed July 28, 2025)



**Figure 6**[4]

64.     Directly below this infographic, ClicknClear states "In order to use one song for any of the above uses, you need a license from both the recording artist, and each of the songwriters." As with the non-existent right to "practise alone," ClicknClear goes on to advertise that "ClicknClear offer[s] ***all of these rights*** with our standard license" (emphasis added).

---

[4] *See, e.g.*, https://www.clicknclear.com/sporteducation/artistic-swimming;
https://www.clicknclear.com/sporteducation/color-guard;
https://www.clicknclear.com/sporteducation/dressage (all last accessed July 28, 2025).

65.     Likewise, for "Fitness," ClicknClear advertises that "fitness professionals and online fitness platforms need high quality recognisable music to accompany their fitness routines and therefore ***need a bundle of specialist rights***," and that these include the right to "[s]et a fitness routine to the mix." (emphasis added). *See* **Figure 7** below.



**Figure 7**[5]

66.     ClicknClear's advertising and promotional materials targeting U.S. consumers, including in presentations given by Defendants Epp and Walsh, have frequently repeated similar statements that participants in performance sports need special licenses to "set choreography"—such as a cheerleading or gymnastics routine, or a marching band formation—to a song or a

---

[5] *See* https://www.clicknclear.com/fitness-professionals-and-platforms (last accessed July 28, 2025).

recorded mix, and that this goes beyond any needed rights to publicly perform or otherwise exploit musical works that are readily available from other sources.

67.    Examples of such instances include a presentation given to the U.S. Equestrian Federation in 2025 by Defendants Epp and Walsh, a promotional video posted to LinkedIn in 2024, a 2023 Instagram post, a webinar first streamed in October 2023 by Defendant Epp, a 2023 briefing memorandum provided to prospective performance sports federations, a "music education webinar" presented to USA Cheer in 2022 (also by Defendants Epp and Walsh), and during an exchange between Defendant Epp (acting on behalf of ClicknClear) with U.S. consumers on Facebook in 2021, as well as the above-referenced presentation given to WGI.[6]

68.    In fact, the license request ClicknClear submitted to Tresóna in September 2023 on behalf of a U.S. public school (again, one with which Tresóna had a pre-existing relationship dating back to a least 2016) for "the right to choreograph to music" was in connection with a "Winter Guard performance."

69.    When asked whether the Winter Guard performance for which ClicknClear sought a license for "the right to choreograph to music" was a ***dramatic*** performance, Defendant Epp simply repeated that the license was "for a Winter Guard performance," indicating that ClicknClear fully understood that the performance was not dramatic and that no such "right to

_____

[6] *See, e.g.,* https://www.youtube.com/watch?v=wB9-ReP-wPw, https://www.linkedin.com/posts/clicknclearmusic_musicindustry-sportsbusiness-musictech-activity-7094631768204431360-2Hn2?utm_source=share&utm_medium=member_desktop&rcm=ACoAABNUFuQBxmt8huHle vziLdRB0fb5KH5kPNQ; https://www.instagram.com/reel/CvrzuBXtRcE/?igsh=YTdoM3ZvaXFuYjhh; https://www.wgi.org/wp-content/uploads/2022/09/WGIconClicknClear.pdf (all last accessed July 28, 2025).

choreograph to music" exists, yet it was nonetheless attempting to obtain such "licensing" and charge a U.S. public school for it.

70.     As recently as May 2025, Defendant Epp stated in her presentation to the U.S. Equestrian Foundation (which, based on publicly available information, is headquartered in Kentucky and has operations and events held in New York): "you need to put your music to choreography, which kind of falls under the scope of grand rights," misleadingly referring to a concept that, under U.S. law, is reserved for **_dramatic_** performances, an issue rarely arising in performance sports.

71.     While copyright owners do license "grand rights" to cover dramatic performances (_i.e._, performances which have a cognizable story or plot, like a musical or opera), such rights are not applicable to the vast majority of consumers that ClicknClear targets in areas such as fitness, marching bands, equestrian sports, figure skating, and cheerleading routines.

72.     This is in keeping with the widely accepted view that the vast majority of such activities are **_non_**-dramatic in nature and do not implicate "grand rights" in any way, nor any related concern that accompaniment of a routine by music creates an altogether new work that demands special licensing.

73.     To the contrary, rightsholders in musical works and sound recordings do not generally require U.S. participants in any of the above-referenced activities to license from them a special right to "set choreography" or "set a … routine" to music for private performances and practice.

74.    In the many years that Tresóna has been a licensing agent for similarly situated groups and ensembles, no such separate "choreography" license has been required for licensees engaging in the activities noted above.

75.    Tresóna has not offered such a license as it recognizes such a license would be illusory.

### Defendants' False and Misleading Statements Regarding
### Licensing for A "Pubic Performance"

76.    For all of the above-referenced activities for which ClicknClear purports to offer licensing (aside from "fitness"), ClicknClear also states consumers must obtain a license for the right to "perform the routine in public" with musical works and/or sound recordings.

77.    On each of the pages on the ClicknClear Website for artistic swimming, cheerleading, color guard, dance, dressage, figure skating, gymnastics, indoor skydiving, and jump rope, ClicknClear includes the below text and infographic shown in close-up in **Figure 8**, advising that "the rights that are needed" include a right to "perform the routine in public with the mix"[7]:

---

[7] On the "Bands/Vocal Ensembles" page of the ClicknClear Website, ClicknClear edits this supposed "right" to read "Perform the routine in public with music: practise & competition." *See* https://www.clicknclear.com/arrangements (last accessed July 28, 2025).



**Figure 8**[8]

78.    As previously, directly below this infographic, ClicknClear states "In order to use one song for any of the above uses, you need a license from both the recording artist, and each of the songwriters" and ClicknClear advertises that it "offer[s] ***all of these rights*** with our standard license" (emphasis added).

---

[8] *See, e.g.*, https://www.clicknclear.com/sporteducation/artistic-swimming; https://www.clicknclear.com/sporteducation/color-guard; https://www.clicknclear.com/sporteducation/dressage (all last accessed July 28, 2025).

79.     While there is indeed a public performance right that exclusively belongs to copyright owners, ClicknClear's advertising and promotional materials targeting U.S. consumers about that right are false and misleading in multiple respects.

80.     With the exception of "dramatic works" requiring "grand" rights, rights of public performance in musical compositions have historically been licensed and administered by Performing Rights Organizations ("PROs") in the U.S., such as ASCAP, BMI, and SESAC.

81.     It is thus false and misleading for Defendants to state that consumers must acquire "specialist" public performance licenses beyond those already offered by PROs—generally held by venues—simply to accompany a non-dramatic routine such as by a cheerleading squad, marching band, dance corps, or equestrian team.

82.     Furthermore, most performances by scholastic competitors and ensembles—such as high school marching bands and cheer teams—whether at school or at school-organized events, are exempt from public performance licensing requirements in the first instance under the Copyright Act's nonprofit public performance exemption, 17 U.S.C. § 110(4).

83.     It is thus false and misleading for Defendants to state that all of the organizations it services, many of which are scholastic, must acquire a "specialist" license in order to publicly perform to music to accompany the types of activities Defendants target.

84.     For all of the above-referenced activities, the ClicknClear Website misleadingly states that "PRO 'Performing Rights' Societies ONLY offer the right to play music, publicly" defining "play" as "Perform music unedited and ***unaccompanied***" (emphasis added), falsely suggesting that performing rights societies do not cover the performance of music if it accompanies a sport or activity.



**Figure 9**

85.    In one place, the ClicknClear Website even goes so far as to state that "[t]he rights needed to perform sports and fitness routines to music go far beyond the simple (and misleadingly named) 'performing rights license' needed by venues to 'perform' music[.]"[9]

86.    To the contrary, public performance licenses offered by ASCAP and BMI can explicitly cover public performances at organizations like dance schools, ice skating rinks, fitness facilities, and nightclubs, where music is frequently performed publicly accompanied by dance or other choreographed movement and/or as mixes, such as by a DJ. *See, e.g.,* ASCAP, Music Licensing for Dance Schools, publicly available at https://www.ascap.com/music-users/types/dance-studio-landing-page (last accessed July 28, 2025); ASCAP, Build My License for Dance Schools, publicly available at https://licensing.ascap.com/?Type=Dance (last accessed July 28, 2025); ASCAP, Music Licensing for Fitness Facilities, publicly available at

---

[9] *See* https://www.clicknclear.com/post/introducing-clicknclear-s-music-license-verification-system-for-sports-and-fitness (last accessed July 28, 2025).

https://www.ascap.com/music-users/types/fitness-landing-page (last accessed July 28, 2025)[10]; BMI, Music License Agreements and Reporting Forms, available at https://www.bmi.com/licensing/forms#seeallcontainer (last accessed July 28, 2025) (listing licenses for, *inter alia*, "Dance Classes"; "Fitness Clubs"; and "Pageants and Competitions"). *See, e.g.,* **Figure 10** below.



---

[10] ASCAP's standard license for fitness facilities authorizes performance of "[r]ecorded music, including through the use of a DJ, used in connection with fitness instruction classes led by an individual located on the Premises." *See* https://www.ascap.com/~/media/files/pdf/licensing/classes/licensing-agreements-current/fitness2017-blank-agreement.pdf (last accessed July 28, 2025).



**Figure 10**

87.     Both ASCAP and BMI also issue public performance licenses for competition purposes, including for a non-exhaustive list of activities that include competitive ice skating, equestrian events, dancing, and cheer leading competitions. *See* **Figures 11-13** below.

 **Music License for Competitions / Shows**

**1. DEFINITIONS**

    (a) **Event** shall mean a competition, show or special program, held on consecutive days, in which participants are evaluated, tested and/or rated on skill, ability or presentation. The term "Event" shall include, but is not limited to (a) beauty pageants, (b) skating events, (c) wrestling matches, (d) boxing matches, (e) cheer leading competitions; (f) karate events; (g) dancing competitions; (h) volleyball matches, (i) bowling tournaments, (j) water-skiing events, (k) body-building competitions, (l) equestrian events, (m) rodeos, (n) dog and cat shows or competitions, or (o) any other non-racing, similar spectator activity. An "Event" shall exclude major and minor league sports, including but not limited to, basketball, hockey, football, baseball and soccer sporting events. (*Please circle the category above that applies to your event.*)

**Figure 11**[11]

**ASCAP Sports & Competitive Event License**

Try to imagine a sports game without the crowd's favorite pump up jams playing over the loudspeakers. Music helps energize the crowd and players and creates a festive, upbeat atmosphere, making it a crucial component of your events.

An ASCAP Sports and Competitive Events license provides access to every genre and variety of music you may need to entertain your crowd and players. Each of our licensees has access to millions of musical works from over 600,000 ASCAP songwriters, composers, and music publishers as well as works from over 90 affiliated societies from all over the world.

Interested in learning more about the Sports and Competitive Events license? Fill out our contact form below and one of our representatives will be in touch with additional information.

**Figure 12**[12]

---

[11] *See* https://www.bmi.com/forms/licensing/gl/39cs.pdf (last accessed July 28, 2025).

[12] *See* https://www.ascap.com/music-users/types/sports-and-competitive-events (last accessed July 28, 2025).



**Figure 13**[13]

88.     Despite this, in a presentation to the U.S. Equestrian Federation, Defendant Epp's presentation given on behalf of ClicknClear specifically stated: "PARTICIPANT RIGHTS ARE **NOT AVAILABLE** FROM A P.R.O. 'PERFORMING RIGHTS' LICENSE" (emphasis and capitalization in original).

89.     Defendants, including in presentations given by Defendants Epp and Walsh, have frequently repeated false and misleading statements regarding the right to publicly perform works.

---

[13] *See* https://www.ascap.com/music-users/types/sports-and-competitive-events (last accessed July 28, 2025).

Examples of such instances include the above-referenced presentation given to the U.S. Equestrian Federation in 2025 by Defendants Epp and Walsh, a video posted to LinkedIn in 2024, a 2023 Instagram post, a webinar first streamed in October 2023 by Defendant Epp, Defendants' presentation to WGI in 2022, and an exchange between Defendant Epp and U.S. consumers on Facebook in 2021.[14]

90.     These statements are false and misleading in at least three ways. First, it is false to suggest that the PROs do not license performance rights for these activities when they specifically do, as shown above.

91.     Second, upon information and belief, ClicknClear does not have the right from rightsholders to license the public performance right historically administered by the PROs as its own license concedes.

92.     ClicknClear's standard license agreement, or "EULA," in fact includes a provision inconsistent with its advertising promises—it states that its customers are "responsible for ensuring that their uses of the Works are … only in venues that have all relevant licenses and clearances from any ***collection societies, incorporations, or entities managing the licensing in relation to public performance*** […], in respect of the rights in the Works embodied in the Mix…."[15].

---

[14] *See, e.g.,* https://www.youtube.com/watch?v=wB9-ReP-wPw,
https://www.linkedin.com/posts/clicknclearmusic_musicindustry-sportsbusiness-musictech-activity-7094631768204431360-
2Hn2?utm_source=share&utm_medium=member_desktop&rcm=ACoAABNUFuQBxmt8huHlevziLdRB0fb5KH5kPNQ;
https://www.instagram.com/reel/CvrzuBXtRcE/?igsh=YTdoM3ZvaXFuYjhh;
 https://www.wgi.org/wp-content/uploads/2022/09/WGIconClicknClear.pdf (all last accessed July 28, 2025).
[15] *See* https://www.clicknclear.com/_files/ugd/6624d0_eb4e9640438f414ea2f3bf3b32efe000.pdf (last accessed July 28, 2025) (emphasis added).

93.     Third, it is thus also false and misleading for ClicknClear to state such a right is included in its standard license.

94.     In the many years that Tresóna has been a licensing agent for similarly situated groups and ensembles, Tresóna has not been authorized to issue any licenses for any type of non-dramatic public performance and has been informed and advised by the rightsholders with whom it works that the licensing of non-dramatic public performance rights is within the purview of the PROs.

### Defendants' Misleading Statements in Advertising Regarding
### Provision of Legal Advice, Products, and Services

95.     Defendants' marketing and advertising practices are founded upon providing misleading legal advice to consumers, both on a general and a particularized basis.

96.     Both through numerous assertions made on the ClicknClear Website and through myriad speaking engagements and presentations, Defendants paint a false picture of licensing requirements to U.S. consumers, inducing them to purchase a purported blanket license which contains illusory rights for which they have no need.

97.     When not offered directly through the ClicknClear Website, the vast majority of these engagements and presentations to U.S. consumers are undertaken on a face-to-face basis, either in person or by remote teleconference, by Defendants Epp and Walsh, upon information and belief, both citizens of the United Kingdom who are licensed to practice law neither in the U.S. nor in the United Kingdom.

98.     The activity-specific pages on the ClicknClear Website, rife with assertions that do not accurately reflect U.S. copyright law, and which mislead as to the actual rights licensed by

ClicknClear, concludes with the below text and graphic purporting to instruct consumers as to music copyright law:



**Figure 14**[16]

99.    Clicking the "Read More" button directs the consumer to an "Education Resources" page that invites consumers to "Learn more about Music Copyright and how it relates to Performance Sports" and includes further links to topics including "Copyright Law for Sports

---

[16] *See, e.g.*, https://www.clicknclear.com/arrangements;
https://www.clicknclear.com/sporteducation/artistic-swimming;
https://www.clicknclear.com/sporteducation/color-guard;
https://www.clicknclear.com/sporteducation/dressage (all last accessed July 28, 2025).

Mixes"; "What is Copyright?"; "Music Licensing Explained"; and "Music Licensing Insights Direct from the Music Industry".

100. The ClicknClear Website couples its false and misleading statements with scare tactics and misleading legal anecdotes.

101. For example, as shown in **Figure 15** below, the ClicknClear Website prominently instructs consumers that "there have been LAWSUITS for music copyright infringement," claiming for example that a cheerleading organization was sued and that "Figure Skating are being sued for infringement at the Olympics."



**Figure 15**[17]

---

[17] *See, e.g.*, https://www.clicknclear.com/arrangements;
https://www.clicknclear.com/sporteducation/artistic-swimming;
https://www.clicknclear.com/sporteducation/color-guard;
https://www.clicknclear.com/sporteducation/dressage (all last accessed July 28, 2025).

102.    Defendants' comments about the lawsuits are also false and misleading, as the lawsuits were adverse to distributors of **unauthorized "mix" recordings** and the unauthorized **television broadcast** of a figure-skating routine where the sound recording was not licensed.[18]

103.    Neither of the two lawsuits Defendants reference asserted violations of rights to "practice alone" or "set choreography to music" nor did they assert that there had been any violations of grand public performance rights. Defendants repeatedly suggest however that those lawsuits could have been avoided had such "rights" been licensed from ClicknClear.

104.    Defendant Epp personally has made false and misleading statements about U.S. litigation to promote ClicknClear and induce fear based on these misleading statements.

105.    Defendants' statements about the law are false and misleading, inducing consumers to believe they are qualified and licensed (they are neither) to give advice on U.S. music law or copyright law.

---

[18] *See Sony Music Entertainment v. Extreme Traxx Productions et al.,* Case No. 1:14-cv-00817 (S.D.N.Y. filed Feb. 10, 2014); *Twelve Sixty LLC et al. v. Comcast Corp., et al.*, Case No. 8:22-cv-00255 (C.D. Cal. filed Feb. 17, 2022).

**Defendants' Unauthorized Provision of Legal Services and Advice**

**Through ClicknClear's "License Verification System"**

106.    In addition to the foregoing, Defendants offer misleading (and unauthorized) legal advice to individual consumers through a service introduced in or about 2022 that it refers to as its "License Verification System" ("LVS").

107.    ClicknClear claims on its website that by using the LVS, consumers can "make sure the appropriate rights have been licensed by the appropriate participant in the appropriate territory at the appropriate time." [19]

108.    Upon information and belief, after campaigns of persuasion by Defendants, major U.S.-based federations and governing bodies for the above-referenced performance sports and activities have required or highly encouraged their participants to use the LVS.

109.    Upon information and belief, such federations and governing bodies include Drum Corps International for drum corps, Winter Guard International for color guard, U.S. Equestrian Federation for dressage, and the National Federation of High Schools for scholastic groups.

110.    In a podcast from October 2024, Defendant Epp specifically stated that participants will be required to use ClicknClear and its licensing goods and services as "they're going to do whatever their federation tells 'em to because it's in their rules . . . and they have to comply if they want to compete."[20]

---

[19] *See* https://www.clicknclear.com/post/introducing-clicknclear-s-music-license-verification-system-for-sports-and-fitness (last accessed July 28, 2025)

[20] *See* https://www.youtube.com/watch?v=Dxhca5MbqJo (last accessed July 28, 2025)

111.    Based on public explanations given by Defendants, the LVS purportedly functions by the user first creating an account with ClicknClear. Next, the user selects the events at which it is performing or competing. The user must then upload the actual sound recording they are using to the LVS, after which an audio "fingerprinting" technology purportedly determines what songs are contained within the sound recording based on musical works within the technology's library (which is limited).

112.    If the technology is unable to identify the musical work, for example if the uploaded sound recording has been heavily edited and therefore not able to be identified by the fingerprinting technology, the user may provide additional information and identify further musical works manually.

113.    The user must then upload proof of licensing documentation. After this, the LVS then purportedly determines whether the user's song information matches the user's proof of licensing documentation and whether the license contains a grant of all necessary "rights." The LVS returns one of three possible status results in this process: "green" for licensed, "yellow" for unverified, and "red" for unlicensed.

114.    Upon information and belief, the LVS only returns an automatic "green" result in the first instance if the license is from ClicknClear, while any license issued by third parties—such as Tresóna or, in fact, copyright owners directly—will return a "yellow" result and Defendants claim it must be manually "verified" to achieve a "green" result. Finally, ClicknClear unilaterally denies verification to users for reasons solely within ClicknClear's discretion.

115.    Upon information and belief, ClicknClear's basis for determining whether a license or purchase documentation should be deemed "verified" or not is the *source* of that license or

purchase as if a license or sound recording is purchased from ClicknClear, then the license or purchase documentation is automatically "verified." By contrast, if a license or sound recording is obtained from any third party—whether Tresóna or any other party—ClicknClear either denies or delays the "verification" of that licensing or purchase documentation for no reason other than that the license or track was obtained from someone other than ClicknClear.

116.    ClicknClear has no legal right, authority, or ability to determine whether any third party license, including one issued by Tresóna, is valid.

117.    Upon information and belief, the LVS is an advertising tool that is used to gather customers and third party licensing data by providing false and misleading information, and a tool that is incapable of providing the legal advice being offered and advertised.

118.    Defendant Epp has stated that when consumers receive an "unlicensed" or "unverified" result *via* the LVS it causes them to "panic."

119.    Upon information and belief, Defendants are then able to exploit such panic by inducing consumers to obtain licenses from ClicknClear instead. As Defendant Epp further stated: "we have found that the verification system can convert people from unlicensed music to licensed music and our system will flag when that piece of music is available on our platform, they can license those missing tracks right then and there. So it, it's, it's also, it's a conversion tool. Um, and that's how we then generate the revenue." ClicknClear positions itself to be the sole, exclusive arbiter of what constitutes "unlicensed music" and what "rights" must be licensed.

120.    As one prominent and public example highlighted, artistic swimming teams for the Paris Olympics, which dealt with ex-U.S. rights but included a delegation from the U.S., were

forced to "upload all music to ClicknClear and have it cleared for use at the Games."[21] The

purported "clearance" only occurred shortly before the event began for some teams and others did

not receive "clearance" at all and had to change their music directly before competition.

121.    Legal analysis is required in order to review a license—which is a binding

contract—and determine whether it applies to use of a musical work or sound recording at an

event, and whether the coverage it provides is sufficient under the particular facts and

circumstances.

122.    This is especially so in the music industry where rights are fragmented and split

among many rightsholders and entities, and where many nuances and exceptions may apply.

123.    Similarly, determining whether a musical work or sound recording is in the public

domain is not as simple as looking at the date of publication of such work. For example, a work

could be in the public domain if it did not meet the proper formalities required under pre-1976

U.S. copyright law, which can only be determined by examining the original publication of the

work itself. This requires careful and close legal analysis of the work in question and the manner

of its publication (if any).

124.    ClicknClear falsely advertises itself as providing legal services and advice to U.S.

consumers, including as reflected in public records of the USPTO.

125.    ClicknClear, relying on a declaration by Defendant Epp, obtained a U.S. trademark

registration for use of the mark "CLICKNCLEAR" in connection with, *inter alia*: "Legal

---

[21] https://slate.com/business/2024/11/figure-skating-music-copyright-infringement-gymnastics-artistic-olympic-sports.html (last accessed July 28, 2025) (citing a conversation held with Defendant Epp).

services"; "providing legal information and legal advice for owners and users of intellectual property rights, copyright and related rights"; "legal services relating to the management of licensing schemes for intellectual property rights, copyright and related rights"; "legal services related to the exploitation of intellectual property rights, copyright and related rights"; "legal services related to the exploitation of intellectual property rights, copyright and related rights by licensing"; and "legal services for the exploitation of music rights" (U.S. Registration No. 6,236,184).

126.    Upon information and belief, ClicknClear does not employ and has never employed any attorneys licensed to practice in New York or any other jurisdiction of the U.S., including in connection with the LVS or to review licenses submitted to the LVS.

127.    Defendants have advertised ClicknClear's LVS as a means for specific U.S. individuals and groups "to verify that [activity participants have] licensed their music correctly in accordance with copyright law," and as providing "an auditable trail that music licensing of all necessary rights is being verified."[22] Such determinations—akin to a chain of title analysis—constitute particularized legal advice that Defendants are neither qualified nor licensed to give.

128.    At base, upon information and belief, the LVS is a document management system whose true purpose is to (1) encumber licensing by third parties such as Tresóna and other ClicknClear competitors by implementing an onerous and deceptive purported verification process for users, (2) force consumers to disclose their information and third party licensing information

---

[22] *See* https://www.clicknclear.com/post/introducing-clicknclear-s-music-license-verification-system-for-sports-and-fitness (last accessed July 28, 2025);
https://www.clicknclear.com/post/stemming-the-copyright-infringement-flow (last accessed July 28, 2025).

(like Tresóna's) to ClicknClear for ClicknClear's own commercial use, and (3) enable ClicknClear to convert consumers to obtain products and services from ClicknClear. No actual "verification" of licenses occurs.

<u>**Defendants' Further False and Misleading Statements Regarding Tresóna**</u>

129.    In addition to false and misleading statements about ClicknClear's own goods and services, Defendants have continued to make false and misleading statements regarding Trésona and its goods and services.

130.    As explained above, Defendants began to make false and misleading statements regarding Tresóna in 2021 when Defendant Epp incorrectly asserted to U.S. consumers on Facebook that Tresóna did not have "pre-clearance" for its licenses while ClicknClear did.

131.    In the presentation given to WGI in or around June 2022, ClicknClear (through its principal Defendant Walsh) suggested that the licenses it offers are "stronger" than those offered by Tresóna as they cover "all" of the rights necessary.

132.    This is false and misleading because, as discussed above, many of the purported rights ClicknClear purports to offer are illusory, unnecessary, and/or incapable of being licensed by ClicknClear in the U.S.

133.    Upon information and belief, ClicknClear further suggested in this presentation that Tresóna does not offer a full license but rather only a certificate. This too is false. Tresóna has always issued a license to consumers—the certificate referenced by ClicknClear was merely proof of licensing further issued following full execution of the agreement and payment of the relevant royalty fee.

134.     In or around January 2024, upon information and belief, Defendant Epp maligned Tresóna by stating, "There is one company in the marching band market that, that sort of has a licensing solution" with a "very bad reputation," again misleadingly suggesting that Tresóna cannot offer required "licensing solutions" to participants in performance sports. Indeed, Defendant Epp went on to say of Tresóna: "we are actively in that market now, taking away their market share[.]"

135.     In or around June 2025, upon information and belief, Defendant Epp again maligned Tresóna by stating, "I feel like we're in a really strong position to do a lot of harm to them."

136.     Upon information and belief, these statements were made in a context where the intended reference to Trésona was evident, purposefully harming Tresóna's reputation and goodwill.

137.     Defendants' business practices reinforce and perpetuate these harmful statements. For example, ClicknClear's "LVS" perpetuates them by only automatically approving the company's own licenses with a "green" light, while requiring further review (and instilling "panic") by presenting a "yellow" light with respect to licenses issued by third parties, including Tresóna.

138.     Customers have told Tresóna that they are facing pressure from their federations and governing bodies to use ClicknClear instead of Tresóna; the pressure is driven at least in part because of ClicknClear's false and misleading statements as well as the LVS.

139.     Against the backdrop of Defendants' misleading statements positioning ClicknClear as the only legitimate provider of "solutions" for performance sports—including by

promising to deliver rights that do not exist—organizations and ensembles required to use LVS by their governing bodies will likely choose to purchase licenses from ClicknClear instead of third parties like Tresóna, as only materials licensed through ClicknClear are guaranteed an immediate "green" light.

140.    To date, Defendants continue to make false and deceptive statements regarding the goods and services ClicknClear offers, namely, its license products and the purported legal services it provides, as well as Tresóna's own goods and services.

141.    Defendants' conduct significantly harms not only Tresóna—who could compete with ClicknClear only by offering its own licenses for unnecessary and non-existent rights—but equally harms New York and U.S. consumers, including many scholastic groups and teams who have spent valuable time and resources purchasing these illusory licenses.

142.    ClicknClear, a stranger to U.S. music licensing practices and U.S. copyright law, profits from and builds a business around this dishonesty. Having failed by other means to persuade ClicknClear to renounce these practices and to compete fairly and without deception, Trésona has no choice but to bring this action.

## COUNT I

**False Advertising in Violation of Section 43(a) of the Lanham Act**

**Against All Defendants**

**(15 U.S.C. § 1125(a))**

143.    Tresóna realleges and incorporates paragraphs 1 through 142 of this Complaint as if fully set forth at length herein.

144.    Defendants have made statements in commercial advertisements and promotions in interstate commerce that certain organizations, including bands and vocal ensembles, require a license from rightsholders to "practise alone," and that ClicknClear offers such a right as a part of its license product sold to consumers.

145.    These statements about ClicknClear's goods and services are false and/or misleading as rightsholders do not license a right to "practice alone" in connection with musical works, as such a right is not encompassed by the exclusive rights held by copyright owners under U.S. copyright law, and ClicknClear cannot offer it as part of its licensing goods and services.

146.    Defendants have made statements in interstate commerce in commercial advertisements and promotions that certain organizations in various fields of performance sports and fitness require a license from rightsholders to "set choreography" to music and/or sound recordings in connection with their performance, and that ClicknClear offers such a right as a part of its licenses sold to consumers.

147.    These statements about ClicknClear's goods and services are false and/or misleading, as rightsholders do not license the right to "set choreography" to music and/or sound recordings and ClicknClear cannot offer it as part of its licensing goods and services.

47

148.    Defendants have made statements in interstate commerce in commercial advertisement and promotions that ClicknClear's standard license includes the right to "perform" choreography or routines publicly to music and/or sound recordings, and that such rights must be acquired by participants in performance sports and fitness because they are not conveyed by performing rights organizations, such as ASCAP, BMI, and SESAC.

149.    These statements are false and/or misleading as performing rights organizations, such as ASCAP, BMI, and SESAC are permitted to license, and do license, rights of public performance of musical compositions in the U.S., including for purposes of accompanying performance sports and fitness and because ClicknClear in fact does not and, upon information and belief, cannot offer any performing rights as part of its licensing goods and services.

150.    ClicknClear offers in interstate commerce a License Verification System in which it purports to "verify" the validity and coverage of licenses not just issued by Defendant but by and between third parties.

151.    Defendants' statements promoting the LVS are false and/or misleading because the verification of whether or not a license complies with U.S. law for uses of a musical work and/or sound recordings requires legal advice and upon information and belief, ClicknClear is not authorized, licensed, or able to provide such legal advice.

152.    ClicknClear is not a law firm, and upon information and belief, does not employ any in house counsel. Upon further information and belief, Defendant Epp and Walsh are not licensed to practice law in any jurisdiction in the U.S. Defendants are in no manner qualified or licensed to render the legal advice as represented in ClicknClear's U.S. Trademark Registration:

"providing legal information and legal advice for owners and users of intellectual property rights, copyright and related rights".

153.    Defendants also misleadingly promote ClicknClear's LVS as objectively "verifying" licenses when it cannot accurately verify the scope or validity of third-party licenses, and instead knowingly uses its LVS to cast doubt over third-party licenses so as to "convert" consumers into licensees of ClicknClear.

154.    Defendants have made statements in interstate commerce in commercial advertising and promotions about Tresóna including that it does not have "pre-clearance" for its catalog and therefore offers the same licenses on a more expensive and/or less efficient basis than ClicknClear, and that Tresóna's licenses do not encompass the full scope of rights that ClicknClear offers in its license.

155.    These statements are false and/or misleading because Tresóna has indeed obtained pre-clearance from rightsholders for a large amount of its catalog and Tresóna does not offer the same rights as ClicknClear because ClicknClear licenses rights which are illusory.

156.    All of the foregoing false and misleading statements go to the nature, characteristics, and qualities of the products and services offered by ClicknClear and/or Tresóna, and are material to and have the tendency to deceive consumers and induce consumer's decisions to purchase products and services from ClicknClear instead of Tresóna.

157.    The foregoing conduct by Defendants has caused injury to Tresóna. Consumers have been diverted to ClicknClear to purchase licenses containing illusory rights from ClicknClear instead of Tresóna due to these false and/or misleading statements.

158.    Moreover, ClicknClear's LVS, offered under the guise of legal advice, upon information and belief, unfairly and misleadingly advantages licenses issued by ClicknClear while negatively treating licenses issued by Trésona, with the purpose of "converting" Trésona's licensees into licensees of Defendant. As a result, Tresóna has suffered harm to its business, reputation, and goodwill, and has suffered monetary damages in an amount to be determined at trial.

159.    Defendants' wrongful acts have been conducted willfully and deliberately, and have caused, or unless retrained by this Court are likely to cause, Trésona and the public great and irreparable damage and injury through, *inter alia,* misrepresentation of the nature and qualities of Defendants' goods, services, and commercial activities; misrepresentation of the nature and qualities of Trésona's goods, services, and commercial activities; miseducation of the public; and damage to Trésona's reputation and competitive position.

160.    Defendants' conduct constitutes false advertising under and violates the Lanham Act, 15 U.S.C. § 1125(a)(1)(b).

161.    Defendants' continued willful and knowing conduct renders this an exceptional case under 15 U.S.C. § 1117(a). Based on such conduct, Trésona is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including Defendants' profits, treble damages, reasonable attorneys' fees, costs and prejudgment interest.

**COUNT II**

**Violation of New York General Business Law §§ 349, 350-a**

**Against All Defendants**

162.     Tresóna realleges and incorporates paragraphs 1 through 161 of this Complaint as if fully set forth at length herein.

163.     Defendants have made and continue to make false and/or misleading statements targeted to consumers regarding the purported music licenses various organizations (encompassing marching bands, vocal ensembles, fitness instructors, and other performance sports teams) must have, including those raised in the preceding paragraphs.

164.     These statements are likely to materially mislead reasonable consumers, and constitute deceptive acts and practices under N.Y. General Business Law § 349 and false advertising under N.Y. General Business Law § 350-a, as the rights Defendants claim rightsholders require and are covered by ClicknClear's license are not actual rights required by rightsholders, required under U.S. copyright law, and/or are not capable of being licensed by Defendant.

165.     ClicknClear also holds itself out as an entity that can provide general and individualized legal advice including through its License Verification System by purporting to verify the validity of licenses between third parties, verifying whether musical works or sound recordings are in the public domain, and verifying whether an organization has obtained the necessary rights to perform at events, including in the U.S.

166.     Many U.S.-based organizations with members, participants, and events in New York, have required their constituents to use the License Verification System and consumers in

New York have used the License Verification System seeking verification of the validity of their licenses with third parties including Tresóna.

167.    Defendants Epp and Walsh, on behalf of ClicknClear, have also answered specific legal questions from consumers, holding themselves out as a legal authority, providing both general legal advice and individualized legal advice based on facts provided.

168.    This conduct is likely to materially mislead reasonable consumers, and constitutes deceptive acts and practices under N.Y. General Business Law § 349, as Defendants are not authorized to practice law in New York or in the U.S.

169.    Tresóna has been injured as a result of these deceptive acts and practices, including because consumers have been misled and opted to purchase licenses from ClicknClear instead of Tresóna, causing harm to Trésona's business, goodwill, and competitive position. As a result, Tresóna has suffered monetary damages in an amount to be determined at trial.

170.    The above-referenced deceptive acts and practices and false advertising harm consumers at large, and enjoining them is in the public interest.

171.    Defendants' wrongful acts are conducted willfully and deliberately, and will continue to cause Trésona irreparable harm and injury unless enjoined by this Court.

172.    Defendants' conduct constitutes deceptive practices under and violates New York General Business Law § 349 and false advertising under New York General Business Law § 350-a.

## **JURY TRIAL DEMAND**

Tresóna requests a trial by jury on all issues so triable of right pursuant to Fed. R. Civ. P. 38.

## **PRAYER FOR RELIEF**

WHEREFORE, Tresóna respectfully demands:

A.     That the Court find that Defendants engaged in false advertising in violation of the Lanham Act;

B.     That the Court find that Defendants violated New York General Business Law §§ 349 and 350-a;

C.     That the Court issue an injunction providing that Defendants and their agents, employees, representatives, partners, joint venturers, and/or anyone acting on behalf of or in concert with Defendants, be enjoined through the world during the pendency of this action and permanently thereafter from:

    (i)     making false and/or misleading statements about music licensing, including that there is a license required from rightsholders of musical compositions and/or sound recordings in order to practice music alone or simply set choreography or a routine to music properly obtained;

    (ii)    making false and/or misleading statements about the public performance right for musical works, including but not limited to that licenses for non-dramatic public performance of musical works can be obtained from Defendant, that qualifying scholastic or non-profit groups are always required to obtain such public performance licenses, and about the public performance licenses offered by United States Performing Rights Organizations, such as ASCAP and BMI;

    (iii)   making false and/or misleading statements in any respect regarding Tresóna;

    (iv)    making false and/or misleading statements about ClicknClear's purported ability to verify third party licenses and/or whether a musical work or sound recording is properly licensed, including whether or not it is in the public domain;

    (v)    offering ClicknClear's License Verification System for any licenses other than those actually granted by ClicknClear;

    (vi)    providing any legal services or advice, including through its License Verification System; and

D.    That an order be issued directing such other relief as the Court may deem appropriate to correct the above-referenced false and/or misleading statements;

E.    That the Court issue an order requiring Defendants to pay to Tresóna all such actual damages attributable to the false advertising and deceptive acts by Defendants and those acting in concert with them in an amount to be proven at trial, and that such damages be trebled pursuant to 15 U.S.C. § 1117 because of the willful and unlawful acts alleged herein;

F.    That the Court award prejudgment interest on all damages awarded by this Court;

G.    That the Court award punitive damages and attorneys' fees and costs under New York law; and

H.    That the Court award such other and further relief as the Court deems just and proper.

DATED:  New York, New York   Respectfully submitted,
    July 28, 2025

             Mitchell Silberberg & Knupp LLP


            By: */s/ Christine Lepera*
             Christine Lepera
             Andrew Nietes
             437 Madison Ave., 25th Floor
             New York, New York 10022-7001
             Telephone: (212) 509-3900
             Facsimile: (212) 509-7239
             Email: ctl@msk.com
             Email: afn@msk.com

             *Attorneys for Tresóna Multimedia, LLC*